UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

ALEX SANCHEZ-BENITEZ,

Petitioner,

v.

PHILIP RHONEY, in his official capacity as Acting Field Office Director, Buffalo Field Office, U.S. Immigration & Customs Enforcement,[1] *et al.*,

Respondents.

---

**DECISION AND ORDER**

6:25-CV-6624 EAW

## INTRODUCTION

Alex Sanchez-Benitez ("Petitioner") currently is detained in the custody of the Department of Homeland Security ("DHS"), U.S Immigrations and Customs Enforcement ("ICE") at the Miami Correctional Facility ("MCF") in Indiana. Through counsel, Petitioner filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. (Dkt. 1). Petitioner claims that his detention has been unconstitutionally prolonged in violation of the Fifth Amendment's Due Process Clause and that he is entitled to a bond

---

[1] Stephen Kurzdorfer previously served as the Acting Field Office Director for the Buffalo Field Office of U.S. Immigration & Customs Enforcement and was replaced by Philip Rhoney. Philip Rhoney is automatically substituted pursuant to Federal Rule of Civil Procedure 25(d). In addition, Michael Ball, Acting Deputy Field Officer Director, is substituted for Joseph Freden, former Deputy Field Office Director; David Venturella, Acting Director of U.S. Immigration and Customs Enforcement, is substituted for Todd Lyons; and Markwayne Mullin, Secretary of the U.S. Department of Homeland Security, is substituted for Kristi Noem. The Clerk of Court is directed to update the docket to reflect these substitutions.

hearing at which ICE has the burden of justifying his continued detention by clear and convincing evidence. (*Id.* at 11-16, ¶¶ 41-55). Petitioner also has filed a motion for a temporary restraining order. (Dkt. 15). For the reasons below, the Court grants Respondent's motion to dismiss (Dkt. 7), dismisses the petition (Dkt. 1) without prejudice, and denies the motion for injunctive relief (Dkt. 15) as moot.

**BACKGROUND**

Petitioner is a native and citizen of El Salvador who entered the United States without inspection near Phoenix, Arizona, on December 24, 2013. (Dkt. 7-3 at 1-2). U.S. Citizenship and Immigration Services ("USCIS") previously had found him qualified for Deferred Action for Child Arrivals ("DACA") protection, which was valid from November 2, 2013, until November 1, 2015. (*Id.*).

ICE's records indicate that on November 28, 2017, Petitioner was arrested in Union County, New Jersey on a criminal complaint and charged with Sexual Assault—Victim At Least 13 But Less Than 16 Years Old; Actor At Least Four Years Older (New Jersey Statutes Annotated ("N.J.S.A.") 2C:14-2C(4)) and Endangering the Welfare of a Child—Sexual Conduct by Caretaker (N.J.S.A. 2C:24-4A(1)). (*Id.* at 2, 11-12).

On November 29, 2017, ICE served Petitioner with a Notice to Appear, charging him with being removable under Immigration and Nationality Act ("INA") § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i), as an alien who is present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the U.S. Attorney General. (*Id.* at 2, 4-5, 8-9). ICE arrested and detained Petitioner on December 14, 2017. (*Id.* at 3).

Petitioner was convicted of one count of N.J.S.A. 2C:24-4A(1) on May 8, 2018, in New Jersey Superior Court. (*Id.* at 12).[2]

Meanwhile, on June 6, 2018, an immigration judge ("IJ") ordered Petitioner removed from the United States to El Salvador. (*Id.* at 6-7). Petitioner waived his right to appeal (*id.* at 6), and he was removed to El Salvador on June 26, 2018 (*id.* at 13).

On April 25, 2024, Petitioner was arrested on a traffic offense and detained at the Union County Jail. (*Id.* at 11). On April 26, 2024, ICE served Petitioner with a Notice of Intent/Decision to Reinstate Prior Order of Removal pursuant to INA § 241.5, 8 U.S.C. § 1231(a)(5), and 8 C.F.R. § 241.8. (*Id.* at 13).

On March 27, 2025, an IJ denied his requests for withholding of removal under INA § 241(b)(3), 8 U.S.C. § 1231(b)(3), and the Convention Against Torture ("CAT"),[3] but granted his request under the CAT for deferral of removal to El Salvador. (*Id.* at 14-15).

[2] It is unclear from the records supplied by Respondents how all charges were resolved. The Court's search of the New Jersey State Courts website reveals that Petitioner was charged by Indictment 18-02-00121-I with two counts of N.J.S.A. 2C:14-2C(4) and two counts of N.J.S.A. 2C:24-4A(1). He pleaded guilty to one count of N.J.S.A. 2C:24-4A(1), and the remaining three charges were dismissed. He was sentenced on June 22, 2018, to 180 days in the county jail. *See* https://www.njcourts.gov/attorneys/ecourts-and-efiling; https://portal.njcourts.gov/webe41/ExternalPGPA/CaptchaServlet (last accessed Aug. 21, 2026).

[3] The INA and the CAT's implementing regulations prohibit DHS from deporting an alien to a country where "the alien's life or freedom would be threatened in that country because of alien's race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C. § 1231(b)(3); or where "it is more likely than not that he or she would be tortured," 8 C.F.R. § 1208.16(c)(2).

Petitioner received notice on June 23, 2025, that DHS intended to remove him to Mexico, a third country not named in the removal order.[4] (*Id.* at 16). The IJ granted Petitioner's unopposed motion to reopen his withholding-only proceedings so he could apply for deferral of removal to Mexico under the CAT. (*Id.*). Petitioner appeared before the IJ on September 11 and September 18, 2025, and testified through an interpreter regarding his fears of persecution and torture if removed to Mexico. (*Id.* at 16). Petitioner primarily asserted that given his tattoos, which indicate that he is a native of El Salvador, gangs and cartels in Mexico may believe, mistakenly, that he is a member of a rival gang and subject him to retaliatory violence. Petitioner also called an expert witness about organized crime and the conditions of Central American migrants and deportees in Mexico. (*Id.* at 16-17).

In a written decision dated September 29, 2025 (*id.* at 16-25), the IJ did "not find that it is more likely than not that [Petitioner] will be subjected to torture by gangs, cartels, or the Mexican government." (*Id.* at 22). Accordingly, the IJ denied Petitioner's application for deferral of removal under the CAT. (*Id.*). Petitioner has pursued an appeal with the Board of Immigration Appeals ("BIA") (*id.* at 23-25), which remains pending.[5]

---

[4] An alien granted withholding-only relief may not be removed "to the country designated in the removal order unless the order of withholding is terminated" but may be removed "to a third country other than the country to which removal has been withheld or deferred." *Johnson v. Guzman Chavez*, 594 U.S. 523, 531-32 (2021) (quoting 8 C.F.R. §§ 208.16(f), 1208.16(f)).

[5] The Executive Officer of Immigration Review's website, which provides automated case information about cases pending before the BIA, shows that the appeal was received on October 29, 2025, and is currently pending. Petitioner filed his appellate brief on July 13, 2026, and that the briefing schedule expired without DHS filing a brief. *See*

On October 30, 2025, with the assistance of the attorneys who represented him in his withholding-only proceedings, Petitioner filed the instant § 2241 petition raised an as-applied due process claim challenging the length of his detention and seeking a bond hearing. (Dkt. 1).

Respondents filed a motion to dismiss (Dkt. 7), memorandum of law (Dkt. 7-1), declaration of Deportation Officer Jacob Graf (Dkt. 7-2), and selected documents from Petitioner's immigration file (Dkt. 7-3). Petitioner filed a memorandum of law in opposition (Dkt. 8), a supporting declaration from Petitioner (Dkt. 7-1), and an exhibit (Dkt. 7-2).

The Court held oral argument via videoconference on February 25, 2026. (Dkt. 12).

Petitioner filed a motion for a temporary restraining order on May 4, 2026. (Dkt. 15). Respondents filed a memorandum of law in opposition. (Dkt. 17). Petitioner filed a reply. (Dkt. 18). On July 24, 2026, Petitioner filed a letter to the Court outlining supplemental legal authority in support of his request for a bond hearing. (Dkt. 19).

## DISCUSSION

### I. Jurisdiction

The Constitution guarantees the availability of the writ of habeas corpus "to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (citing U.S. Const., Art. I, § 9, cl. 2). "The essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the

---

https://acis.eoir.justice.gov/en/caseInformation (search results for Petitioner's A-number) (last accessed September 6, 2026).

writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). A writ of habeas corpus may be granted to a petitioner who demonstrates that he is in custody in violation of the Constitution or federal law. *See* 28 U.S.C. § 2241(c)(3). A § 2241 proceeding is civil in nature, and the petitioner bears the burden of proving the illegality of his or her detention by a preponderance of the evidence. *Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011).

In the immigration context, habeas corpus review before a district court is available to "challenge to the length or conditions of confinement," as opposed to a "challenge that raise[s] legal questions challenging the government's very basis for trying to remove (and thus detain[ ]) him." *Mehrali v. Ball*, No. 26-CV-00809-JON, 2026 WL 2191402, at *2 (W.D.N.Y. July 30, 2026) (quoting *Mahdawi v. Trump*, 183 F.4th 103, 117 (2d Cir. 2026)) (quotation marks omitted).

Here, Petitioner challenges only the constitutionality of his continued detention in Respondents' custody based on its length and conditions. Therefore, the Court has subject matter jurisdiction over the petition.

## II. Statutory and Regulatory Framework for Petitioner's Detention

### A. 8 U.S.C. § 1231(a)(6) and Post-Removal Period Detention

As noted above, Petitioner is subject to a reinstated order of removal[6] and is in withholding-only proceedings. Section 1231 governs the detention and removal of aliens

---

If an alien reenters the United States illegally after having been removed, "the prior order of removal is reinstated from its original date." 8 U.S.C. § 1231(a)(5). Furthermore, the reinstated removal order "is not subject to being reopened or reviewed, the alien is not

subject to administratively final orders of removal, including reinstated orders of removal. 8 U.S.C. § 1231(a); *see also Johnson v. Guzman Chavez*, 594 U.S. 523, 526 (2021) ("*Guzman Chavez*") ("We conclude that § 1231, not § 1226, governs the detention of aliens subject to reinstated orders of removal, meaning those aliens are not [statutorily] entitled to a bond hearing while they pursue withholding of removal.").

Under § 1231, ICE "shall detain the alien" and physically remove him from the United States within a 90-day "removal period." 8 U.S.C. § 1231(a)(1)(A), (2). Here, the order of removal was administratively final as of July 6, 2024, the date of the decision reinstating it. *Guzman Chavez*, 594 U.S. at 534-35 (citing 8 U.S.C. § 1231(a)(1)(B)(i), (a)(5)). Thus, the removal period began on July 6, 2024, the date the reinstated order was administratively final, *see id.* § 1231(a)(1)(B)(i); it ended 90 days later, on October 4, 2024.

The INA provides that "an alien may be detained beyond the removal period or released under supervision if he is (1) inadmissible, (2) removable as a result of violations of status requirements, entry conditions, or the criminal law, or for national security or foreign policy reasons, or (3) a risk to the community or unlikely to comply with the removal order." *Guzman Chavez*, 594 at 529 (citing 8 U.S.C. § 1231(a)(6); 8 C.F.R. § 241.4); *see also id.* at 528 (discussing other circumstances in which aliens may be detained after the removal period (citing 8 U.S.C. § 1231(a)(1)(C), (c)(2)(A)). "Continued detention under this provision creates the 'post-removal-period.'" *Id.*

---

eligible and may not apply for any relief under this chapter, and the alien shall be removed under the prior order at any time after the reentry." *Id.*

In *Zadvydas v. Davis*, 533 U.S. 678 (2001), the Supreme Court addressed whether § 1231(a)(6) permitted the indefinite detention of two noncitizens who were subject to a final order of removal but could not be removed because no country would accept them. Reasoning that "[a] statute permitting indefinite detention of an alien would raise a serious constitutional problem," the Supreme Court held that § 1231(a)(6) should not be interpreted to authorize indefinite detention, absent a clear statement by Congress. 533 U.S. at 690, 696-97. The Supreme Court thus "read an implicit limitation into" § 1231(a)(6), holding that it "limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States." *Id.* at 689.

"[F]or the sake of uniform administration in the federal courts," the Supreme Court recognized six months as a "presumptively reasonable period" during which the government may detain the alien while it seeks to effectuate his or her removal. *Id.* at 701. "After this 6-month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.*

However, this "does not mean that every alien not removed must be released after six months." *Id.* Rather, "an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.*; *see also Clark v. Martinez*, 543 U.S. 371, 384 (2005) (*Zadvydas* "held that, since interpreting the statute to authorize indefinite detention (one plausible reading) would approach constitutional limits, the statute should be read (in line with the other plausible

reading) to authorize detention only for a period consistent with the purpose of effectuating removal" (citing 533 U.S. at 697-99)).

**B. 8 C.F.R. § 241.4 and Periodic Custody Reviews**

Section 241.4, which is part of § 1231's implementing regulations, classifies the noncitizens who may be subject to continued detention, establishes the process and criteria for assessing whether continued detention is warranted, and designates the officials to whom DHS has delegated decision-making authority "to continue an alien in custody or grant release or parole." 8 C.F.R. § 241.4(a).

If an alien is not removed within 90 days of the removal order becoming final, ICE must review his or detention before the end of that 90-day period. 8 C.F.R. § 241.4(k)(1)(i). This review is commonly called the 90-day review or the 90-day POCR (*i.e.*, post-order custody review). The 90-day review is typically based on the noncitizens's records, though ICE has the discretion to conduct a personal or telephonic interview. *Id.* § 241.4(h)(1). The reviewing ICE official may, but is not required to, release a noncitizen whose "release will not pose a danger to the community or to the safety of other persons or to property or a significant risk of flight." *Id.* § 241.4(d), (h)(1), (k)(1). To release the noncitizen, the ICE official must conclude that:

> (1) Travel documents for the alien are not available or . . . immediate removal, while proper, is otherwise not practicable or not in the public interest;
> (2) The detainee is presently a non-violent person;
> (3) The detainee is likely to remain nonviolent if released;
> (4) The detainee is not likely to pose a threat to the community following release;
> (5) The detainee is not likely to violate the conditions of release; and
> (6) The detainee does not pose a significant flight risk if released.

*Id.* § 241.4(e); *see also id.* § 241.4(h)(3) (listing "factors to be weighed in considering whether to recommend further detention or release").

The noncitizen is entitled to written notice before the 90-day review occurs, *id.* § 241.4(h)(2); may submit written information supporting his or her release, which the ICE official must review; and has the right to receive assistance in preparing his or her response, *id.* § 241.4(h)(1), (2). ICE must provide the noncitizen with a written copy of the decision, *id.* § 241.4(h)(4), and, if release is denied, the decision must "set forth the reasons for the continued detention," *id.* § 241.4(d). No appeal from an adverse decision is available. *Id.*

ICE's Headquarters Post-Order Detention Unit ("HQPDU") is tasked with performing "all further custody determinations" for "any alien who has not been released or removed by the expiration of the three-month period after" the 90-day POCR. *Id.* § 241.4(c)(2); *see also id.* § 241.4(k)(2)(ii). The initial review by HQPDU typically occurs "at the expiration of the three-month period after the 90-day review or as soon thereafter as practicable." *Id.* § 241.4(k)(2)(ii). This review is generally referred to as the 180-day review or the 180-day POCR. The HQPDU has the discretion to release an alien if the "release will not pose a danger to the community or to the safety of other persons or to property or a significant risk of flight." *Id.* § 241.4(d)(1). When deciding whether to exercise this discretion, the HQPDU must make the same findings that are required before releasing an alien at the 90-day review. *See id*. § 241.4(e)-(f).

If detention continues after the 180-day review, the regulations provide for a "subsequent review" which "shall ordinarily be commenced for any detainee within

approximately one year of a decision by the Executive Associate Commissioner declining to grant release." *Id.* § 241.4(k)(2)(iii). Not more than once every three months in the interim between annual reviews, the noncitizen "may submit a written request to the HQPDU for release consideration based on a proper showing of a material change in circumstances since the last annual review." *Id.* Section 241.4's schedule of reviews—90 days, 180 days, and annually thereafter—is not set in stone. An ICE official may, "in his or her discretion," "schedule a review of a detainee at shorter intervals when he or she deems such review to be warranted." *Id.* § 241.4(k)(2)(v). Similarly, an ICE official may, "in his or her discretion, suspend or postpone the custody review process if such detainee's prompt removal is practicable and proper, or for other good cause." *Id.* § 241.4(k)(3).

Petitioner states that to his knowledge, he has only had one custody review. (Dkt. 8-1 at 2, ¶ 1). It occurred after he had been detained at Moshannon Valley Processing Center ("MVPC") for 90 days, in October or November 2024. (*Id.*). A guard at MVPC "gave [him] a paper from ICE to fill out and return," with questions that were in English; there was no Spanish translation. (*Id.*). Petitioner filled out the form with his sister's help over the phone. (*Id.*). The form asked if he "had somewhere to live, to work, family to support [him], and some other simple questions." (*Id.*). Within two weeks after completing and returning the form, he received a decision saying that he "was a danger because of the DUI [he] had even though that charge had been dismissed." (*Id.* (citing Dkt. 8-2[7] at 2)). Petitioner has "never been interviewed in person by ICE while detained." (*Id.* at ¶ 2).

---

[7] Docket 8-2 is a printout of the search results for Petitioner's case (#GT 15004939-00) in the Fairfax County General District Court ("GDC") of the Commonwealth of

## III. Merits of the Petition

### A. Overview of the Parties' Arguments

Petitioner asserts one claim for habeas relief—that his post-removal period detention under § 1231(a)(6) has become unreasonably prolonged in violation of his Fifth Amendment procedural due process rights. Petitioner further contends that under the three-part balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), he is entitled to additional process in the form of a bond hearing before an IJ at which the government bears the burden of justifying his detention with clear and convincing evidence that he is either a flight risk or a danger to the community. (Dkt. 1 at 11-16, ¶¶ 41-55, Dkt. 8 at 5-6 (citing *Black v. Decker*, 103 F.4th 133 (2d Cir. 2024) (ordering bond hearing for alien detained under § 1226(c)), *cert. granted sub nom. Genalo v. Black,* No. 25-886, 2026 WL 1718025 (U.S. June 15, 2026); *Velasco Lopez v. Decker*, 978 F.3d 842 (2d Cir. 2020) (ordering bond hearing for alien detained under § 1226(a)).

Respondents contend that because Petitioner is detained under § 1231(a)(6), he is foreclosed from obtaining a bond hearing by *Johnson v. Arteaga-Martinez*, 596 U.S. 573, 579 (2022) ("*Arteaga-Martinez*"). (*See* Dkt. 7-1 at 4 ("This Petition must be dismissed as it seeks to compel Respondents to provide a bond hearing which is not proscribed for by

---

Virginia. The GDC hears traffic violation cases, misdemeanors, and various civil matters such as landlord and tenant disputes; all cases in this court are heard by a judge, not a jury. *See* https://www.fairfaxcounty.gov/generaldistrict/generaldistrict (last accessed Aug. 19, 2026). The printout indicates that Petitioner was arrested for driving while intoxicated ("DWI"), a misdemeanor, on January 11, 2015. (Dkt. 8-2 at 2). On June 8, 2015, the parties appeared for a "final adjudicatory hearing." (*Id.*). The "disposition" after the final adjudicatory hearing was "not guilty." (*Id.*).

statute or case law.”)). Although Petitioner has not raised a *Zadvydas* claim, Respondents assert that he “is not entitled to release under *Zadvydas* because he “fails to demonstrate that Respondents are unlikely to enforce the removal order against [him] in the reasonably foreseeable future.” (*Id.* at 5).

**B. Section 1231(a)(6) Does Not Require Bond Hearings**

In *Arteaga-Martinez*, the noncitizen had obtained a bond hearing under then-controlling Third Circuit precedent, *Guerrero-Sanchez v. Warden York Cnty. Prison*, 905 F.3d 208 (3d Cir. 2018), *abrogated by Arteaga-Martinez*, 596 U.S. 573. In *Guerrero-Sanchez*, the Third Circuit relied on *Zadvydas* and employed the canon of constitutional avoidance to hold that “a noncitizen facing prolonged detention under § 1231(a)(6) is entitled by statute to a bond hearing before an immigration judge and must be released from detention unless the Government establishes, by clear and convincing evidence, that the noncitizen poses a risk of flight or a danger to the community.” *Id.* at 224.

After Arteaga-Martinez had been detained for four months pending resolution of his withholding-only proceedings, he filed a petition for writ of habeas corpus. 596 U.S. at 577. The district court ordered that Arteaga-Martinez must receive a *Guererro* hearing once he had been detained for six months. *Id.* at 577-78. The government appealed, the Third Circuit affirmed, and the Supreme Court granted *certiorari. Id.* at 578.

The question presented was “whether § 1231(a)(6) requires bond hearings before immigration judges after six months of detention in which the Government bears the burden of proving by clear and convincing evidence that a noncitizen poses a flight risk or a danger to the community.” *Id.* at 580. The Supreme Court held that the “text [of

§ 1231(a)(6)], which does not address or 'even hin[t]' at the requirements imposed" by the courts below, "direct[ed]" that the question presented be answered "in the negative." *Id.* at 581 (alteration in original) (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 298 (2018)). The Supreme Court explained that the Third Circuit had wrongly applied the canon of constitutional avoidance because "there is no plausible construction of the text of § 1231(a)(6) that requires the Government to provide bond hearings before immigration judges after six months of detention, with the Government bearing the burden of proving by clear and convincing evidence that a detained noncitizen poses a flight risk or a danger to the community." *Id.* Respondents thus are correct that, as a matter of statutory interpretation, § 1231(a)(6) does not require a bond hearing after any particular period of detention.

In addition to his statutory claims, the petitioner in *Arteaga-Martinez* separately contended that "reading § 1231(a)(6) not to require bond hearings when detention becomes prolonged 'raises serious due process concerns.'" *Id.* at 583 (citation to record omitted); *see also Zadvydas*, 533 U.S. at 690 ("A statute permitting indefinite detention of an alien would raise a serious constitutional problem."). "The Government also note[d] that as-applied constitutional challenges remain available to address 'exceptional' cases." *Id.* (citation to record omitted). The Supreme Court, citing its role as a court of "review" versus "first view," *id.* (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 718, n.7 (2005)), remanded the constitutional claim for the lower court to consider "in the first instance," *id.* (citing *Jennings*, 583 U.S. at 312).

### C. As-Applied Due Process Challenges to Detention Under § 1231(a)(6) Remain Available

Following *Arteaga-Martinez*, this Court and others have recognized the availability of an as-applied due process challenge in the post-removal period detention context. *See Chavez-Gonsalez v. Ball*, No. 6:23-CV-06238 EAW, 2024 WL 1268282, at *4 (W.D.N.Y. Mar. 26, 2024) ("*Arteaga-Martinez* did not reach the issue of whether the Due Process Clause might require bond hearings for individuals detained under § 1231(a)(6) on an as-applied basis, leaving that question 'for the lower courts to consider in the first instance.'" (quoting 596 U.S. at 583)); *see also Molina v. Joyce*, No. 25-CV-1844 (LAK), 2026 WL 1893736, at *9-10 & n.107 (S.D.N.Y. July 1, 2026) (stating that "[a]t least as of now, 'as-applied constitutional challenges . . . to address exceptional cases' remain available" to § 1231(a)(6) detainees) (ellipsis in original) (quoting *Arteaga-Martinez*, 596 U.S. at 583).

As in *Chavez-Gonsalez*, the Court "will apply *Mathews* in deciding Petitioner's due process claim." 2024 WL 1268282, at *6 (citing *Velasco Lopez*, 978 F.3d at 851 (applying *Mathews* in evaluating whether the "ongoing incarceration [of the § 1226 detainee] posed due process concerns at the time of his habeas filing and whether additional procedural protections then became necessary")); *see also Molina*, 2026 WL 1893736, at *11 (finding that "[t]he *Mathews* framework is the appropriate test by which to evaluate Caceres's as-applied due process claim for the same reasons the Second Circuit found it 'apt' in *Velasco Lopez* and *Black*"); *Cabrera Galdamez v. Mayorkas*, No. 22 Civ. 9847 (LGS), 2023 WL 1777310, at *4 (S.D.N.Y. Feb. 6, 2023) ("Given the largely parallel due process concerns

at issue in § 1226(a) and § 1231(a)(6), and that both provisions concern immigration detention as a matter of discretion, the *Mathews* test is appropriate to apply here.”).

**D. Application of *Mathews***

The three factors identified in *Mathews* are: (1) “the private interest that will be affected by the official action”; (2) “the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards”; and (3) “the Government’s interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.” 424 U.S. at 335.

“Here, the private interest affected by the official action is the most significant liberty interest there is—the interest in being free from imprisonment.” *Velasco Lopez*, 978 F.3d at 851. At the time he filed the petition on October 30, 2025, Petitioner had been in immigration detention since July 6, 2024—just under sixteen months. During his time in ICE custody, he has been housed at a few detention facilities, including BFDF, MVPC, and most recently, MCF. “The BFDF, ‘while perhaps not akin to a maximum-security prison,’ is not, for many individuals, ‘meaningfully different from at least a low-security penal institution for criminal detention.’” *Chavez-Gonsalez*, 2024 WL 1268282, at *5 (quoting *Wilson v. Barr*, No. 1:19-CV-01364 EAW, 2020 WL 13554798, at *7 (W.D.N.Y. May 1, 2020)). District courts have found that “the conditions at Moshannon [*i.e.*, MVPC,] are penal in character.” *Grigoryan v. Jamison*, No. 25-CV-1389, 2025 WL 1257693, at *5 (E.D. Pa. Apr. 30, 2025). Petitioner describes MCF, where he is presently confined, as

"the worst facility" he has "ever been at." (Dkt. 8-1 at ¶ 3).[8] Though the deprivation of liberty that Petitioner has experienced in ICE custody "was not the result of a criminal adjudication," *Velasco Lopez*, 978 F.3d at 851, the conditions of confinement have not been "meaningfully different from a penal institution for criminal detention," *Wilson*, 2020 WL 13554798, at *5 (quoting *Cabral v. Decker*, 331 F. Supp. 3d 255, 261 (S.D.N.Y. 2018)).

The Court finds that the first *Mathews* factor favors Petitioner, given the weightiness of his interest in being free from government custody. *See Pucha Quituizaca v. Barr*, No. 20-CV-403, 2020 WL 3166732, at *7 (W.D.N.Y. June 15, 2020) (finding that the noncitizen's "interest in his freedom pending the conclusion of his removal proceedings deserves great 'weight and gravity'" (quoting *Addington v. Texas*, 441 U.S. 418, 427 (1979)).

Turning to the second *Mathews* factor, "[p]rocedural due process rules are shaped by the risk of error inherent in the truth-finding process." *Velasco Lopez*, 978 F.3d at 852 (citing *Mathews*, 424 U.S. at 344). "The Court thus must ask whether 'the procedures underpinning Petitioner's lengthy incarceration markedly increased the risk of error.'" *Chavez-Gonsalez*, 2024 WL 1268282, at *5 (alteration omitted) (quoting *Velasco Lopez*,

---

[8] According to Petitioner, the MCF constantly denies him and the other detainees adequate food as well as soap and basic hygiene products, including toilet paper, razors, and nail clippers. (Dkt. 8-1 at ¶ 4). Everyone is "so hungry" that "[a]lmost every day someone is taken out of cafeteria in handcuffs because they try to take extra food." (*Id*. at ¶ 6). Petitioner notes that at other facilities, detainees were paid to clean, but that is not the case at MCF. (*Id*. at ¶ 4). The showers are never clean; the trash bins are overflowing; and the dormitory where he and the other detainees sleep often floods with dirty water that smells like it came from the toilet. (*Id*.). He and the other detainees are only given one pair of perforated plastic sandals, which they must wear indoors, including in the showers, and outdoors in the snow. (*Id*. at ¶ 5).

978 F.3d at 852). "[A]nalysis of the second *Mathews* factor is highly fact specific." *Id.* at *6. For instance, in *Velasco Lopez*, the Second Circuit found it significant that "[a]fter fifteen months, the Government had not found information sufficient to show that [the noncitizen] was a poor bail risk, and indeed, it was in possession of important information indicating the contrary[.]" 978 F.3d at 852-53 (explaining that ICE had refused to produce the petitioner for criminal court appearances related to pending state charges and that "[w]hen ICE finally did produce him, the charges were dismissed").

Neither Petitioner nor Respondents have provided the Court with copies of the detention decision or any documentation generated in connection with the 90-day custody review. All the Court has before it is Petitioner's assertion that ICE denied release because it found he was a danger to the community due to his 2015 misdemeanor DWI charge (Dkt. 8-1 at 2, ¶ 1), that apparently was dismissed (Dkt. 8-2 at 2). The Court notes that ICE's records contain conflicting information about the DWI charge. At one point, ICE states that the charge remained pending as of 2024. (Dkt. 7-3 at 11). On the same page, ICE states that the charge was dismissed on June 8, 2015, by the Virginia state court. (*Id.*). All that said, the regulations do not appear to limit the nature of the information ICE may consider or prohibit ICE from relying on arrests versus actual convictions when assessing dangerousness. So the fact that ICE referenced the dismissed DWI charge does not necessarily show that the 90-day POCR was based on erroneous fact-finding or a misreading of the record.

Further, Petitioner has not disputed that he has an intact criminal conviction from 2018 for a sexual offense involving a minor. (Dkt. 7-3 at 11). Nor does he assert that it

would have been improper for ICE to consider this conviction in assessing his present and future dangerousness. *See Chavez-Gonsalez*, 2024 WL 1268282, at *6 (noncitizen's failure to argue that other evidence in ICE's possession was insufficient to support the conclusion that he presented a significant risk of flight or a danger to the community weighed against him at step two of *Mathews*).

Apart from asserting that ICE relied on the dismissed DWI charge, Petitioner makes no other arguments specific to *his circumstances* as to why the procedure associated with the 90-day POCR increased the likelihood of error. As to the probable value, if any, of additional procedural safeguards such as a bond hearing, Petitioner says that "the decisionmaker would consider that [Petitioner] has not been charged with a crime since 2017." (Dkt. 8-1 at 13). Presumably, the ICE official who performed the documents review could see that Petitioner's most recent criminal charges were in 2017. Moreover, Petitioner omits any mention of other unfavorable facts that a decisionmaker at a bond hearing certainly would consider, namely, that the 2017 charges were resolved by Petitioner's guilty plea and conviction in 2018. The decisionmaker at a bond hearing also would consider Petitioner's illegal reentry into the United States and subsequent arrest for a traffic offense.

Petitioner's barebones argument says nothing about how or why a bond hearing would add value to the custody determination in *his case* or why the 90-day POCR increased the risk of error in *his case*. The relevant issue in this as-applied due process challenge is whether *Petitioner* erroneously has been deprived of his liberty, *Chavez-*

*Gonsalez*, 2024 WL 1268282, at *6; it is not whether, as a general matter, the custody review procedures set forth in § 241.4 are sufficient.

An individual "claiming denial of due process in immigration cases must, in order to prevail, allege some cognizable prejudice fairly attributable to the challenged process." *Chavez-Gonsalez*, 2024 WL 1268282, at *6 n.7 (quoting *Garcia-Villeda v. Mukasey*, 531 F.3d 141, 149 (2d Cir. 2008) (quotation omitted in original)). However, "Petitioner has not identified what he alleges to be the cognizable prejudice in this case (*i.e.* how the alleged procedural deficiencies impacted the outcome of his custody review[])." *Id.* Because Petitioner has not shown that the procedures used by ICE resulted in a markedly increased risk of error in *his* case, or that additional procedures markedly would decrease the risk of error in *his* case, step two favors Respondents.

The Court next considers "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. It is "well-established" that the government has an important interest in ensuring that noncitizens do not abscond and do not commit crimes while released. *Velasco Lopez*, 978 F.3d at 854. By the same token, the government lacks "an interest in the prolonged detention of noncitizens who are neither dangerous nor a risk of flight." *Id.*

In *Cabrera Galdamez*, a case relied on by Petitioner, the noncitizen "provided sufficient evidence that 'the Government might find difficult to overcome if it had to demonstrate affirmatively'" that he "pose[d] a risk of flight or danger to the community necessitating his continued detention." 2023 WL 1777310, at *6 (quoting *Jimenez v.*

*Decker*, No. 21 Civ. 880, 2021 WL 826752, at *9 (S.D.N.Y. Mar. 3, 2021) (internal quotation marks omitted in original)). For instance, the noncitizen had a "thorough release plan" and the means to carry it out, a mother and young daughter in New York City, a plan to "seek mental health services to address his diagnosed PTSD," and a "food handling certificate, which [would] help him in his search for employment outside of detention." *Id.* Given his "strong incentives to remain in New York City" and "a network at the Bronx Defenders" to "support him in carrying out his release plan," *id.*, the noncitizen's "continued detention [was] not well-aligned with either fundamental purpose of detention: mitigating flight risk or preventing danger to the community," *id.* at *7.

By contrast, Petitioner has not provided any information of the sort presented in *Cabrera Galdamez*, such as details about a release plan, any family ties in the United States, other networks of community support, or housing or employment prospects. In other words, "Petitioner makes no argument regarding how his continued detention *in particular* does or does not align with the [Respondents'] interests in mitigating flight risk and preventing danger to the community." *Chavez-Gonsalez*, 2024 WL 1268282, at *7 (emphasis in original). Instead, Petitioner asserts that the government's "interest is not defeated, but rather served by an individualized bond hearing at which a neutral arbiter will determine whether or not [he] is likely to abscond or commit a criminal offense in the future after reviewing evidence provided by both parties." (Dkt. 8-1 at 13). Petitioner has merely restated the procedure to be used, and the relevant issues to be determined, at a bond hearing. Moreover, as noted above, Petitioner has provided no indication of the nature of the evidence that he would submit at a bond hearing to try to convince a neutral

arbiter that he is *not* likely to abscond or *not* likely to commit crimes if released. *See Chavez-Gonsalez*, 2024 WL 1268282, at *7 (noncitizen's argument that a bond hearing would "minimize[ ] the enormous impact of incarceration in cases where it serves no purpose" was unpersuasive where he "pointed to nothing to support the conclusion that this is such a case") (alteration in original) (quotation to record omitted)). Based on the specific record before the Court, the third *Mathews* factor favors Respondents.

Thus, given the foregoing, Petitioner has not demonstrated that § 1231(a)(6), as applied to his particular case, has deprived him of his procedural due process rights. "The Court does not hold or suggest that on a different record, an as-applied challenge to prolonged detention under § 1231(a)(6) could not succeed." *Chavez-Gonsalez*, 2024 WL 1268282, at *7.

**CONCLUSION**

For the reasons discussed above, the Court grants Respondents' motion to dismiss (Dkt. 7) and dismisses the petition (Dkt. 1). The dismissal is "without prejudice to Petitioner's ability to bring subsequent challenges to his detention." *Chavez-Gonsalez*, 2024 WL 1268282, at *7 (citing *Velasco Lopez*, 978 F.3d at 853). Petitioner's motion for a temporary restraining order (Dkt. 15) is dismissed as moot.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated: September 9, 2026
Rochester, New York